**DISTRICT OF COLUMBIA, Appellant,**

v.

**Ferdinand BANKS, Appellee.**

**No. 92–CV–928.**

District of Columbia Court of Appeals.

Argued May 19, 1994.

Decided Aug. 18, 1994.

Edward E. Schwab, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief for appellant.

Benjamin F. Saulter, Washington, DC, for appellee.

Before SCHWELB and FARRELL, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

A jury awarded Ferdinand Banks $360,000 against the District of Columbia for personal injuries suffered by Banks when his car was struck by a stolen automobile which was being operated by seventeen-year-old Anthony Webb. In order to elude capture by pursuing officers of the Metropolitan Police Department (MPD), Webb drove recklessly and at a high rate of speed. He eventually ran through several red lights and crashed into Banks' automobile.

Banks claimed on two different but related grounds that the District was responsible for his injuries. In Count I of his complaint, he alleged that Officer Peter Hyder was grossly negligent in conducting the chase and in failing to terminate it, and that the District was therefore liable to him pursuant to D.C.Code § 1–1212 (1992). In Count II, Banks asserted that Sergeant Melvin L. Scott supervised the pursuit in a negligent manner. In response to specific interrogatories propounded to them in the verdict form at the conclusion of the trial, the jurors found that "the officer" [Hyder] was grossly negligent in the "high speed chase" and that the District "was negligent in supervising the officer conducting the pursuit."

The District filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The judge denied the motion in a written memorandum opinion and order. *Banks v. District of Columbia*, 120 Daily Wash.L.Rptr. 1605 (Super.Ct.D.C.1992) (*Banks I*). On appeal, the District contends that the evidence was insufficient as a matter of law to prove that Hyder was grossly negligent, that the judge instructed the jury incorrectly both with respect to the gross negligence claim and with respect to the negligent supervision claim, and that the judge made several erroneous evidentiary and other rulings.

We agree with the District that the trial judge incorrectly instructed the jury that the plaintiff was required only to show ordinary negligence, rather than gross negligence, in order to prevail on the negligent supervision claim. The District did not object to the

instruction, however, but on the contrary effectively invited it. We therefore conclude that although the instruction was erroneous, there was no plain error. Because the negligent supervision finding alone supports the verdict,[1] and because, in our view, none of the District's other contentions justifies reversal, we affirm the judgment without reaching the substantial and difficult issues relating to Banks' claim in Count I of gross negligence in the conduct of the pursuit. *But see* the concurring opinion of Judge FARRELL, *post*, at 983, addressing these issues.

### I.

### THE EVIDENCE

*A. The Pursuit.*

On February 13, 1989, an employee of the United States Congress reported that her black 1986 Pontiac Grand Am had been stolen from the Congressional parking lot in southwest Washington, D.C. The automobile had New York tags.

On the following day, Officer Alphonso McAllister was in a scout car patrolling the area of Wilson High School, which is located at 40th and Chesapeake Streets, N.W. At about 1:00 p.m., Officer McAllister saw a car with New York tags cruising the Wilson High School area at a normal rate of speed. McAllister radioed his dispatcher, requesting that she "run the tags," and learned that the automobile had been reported stolen. By that time, the driver of the Grand Am, who later proved to be Anthony Webb, had left the area. Officer McAllister radioed other units to be on the lookout for the automobile. Moments later, McAllister saw the stolen car again and was able to reach a point within three blocks of it. Webb apparently saw McAllister, however, and took evasive action, and McAllister lost him.

The stolen Grand Am was soon spotted by Officer David Willis, who had monitored the radio transmission. By the time Willis had turned his vehicle around, however, Webb had eluded him. Shortly thereafter, Officer

---

1. So far as we can discern, Banks' damages resulting from negligent supervision are identical to those caused by grossly negligent pursuit, and the District has not asserted the contrary.

Hyder saw Webb driving the vehicle on Nebraska Avenue near Military Road. Hyder attempted to follow Webb, lost sight of him, and then saw him again on Military Road near 27th Street, zig-zagging to pass other cars. Hyder turned on his emergency equipment and continued to follow Webb through Rock Creek Park and on several streets in the area. Travelling east on Missouri Avenue past Brightwood Elementary School, Webb turned right on 13th Street, running a red light as he made the turn. Heading south on 13th Street at speeds estimated at fifty to eighty miles per hour,[2] Webb went through successive red lights at Colorado Avenue and Kennedy Street. He ultimately broadsided Banks' vehicle, which was travelling east on Kennedy Street. Banks suffered serious injuries. Webb attempted to flee on foot, but Hyder apprehended him in an alley near the crash site.

### B. The Supervision of the Pursuit.

Sergeant Scott was the patrol supervisor on February 14, 1981. Officers Hyder, McAllister and Willis were under his command. Scott was in his scout car at the Second District station from the time Officer McAllister first saw Webb cruising near Wilson High School until the end of the chase, when Officer Hyder arrested Webb. Scott listened to the radio transmissions during this period and went to the accident scene shortly after Webb's arrest.

As a supervisor, Sergeant Scott had the authority to order Officer Hyder to terminate the pursuit. Scott testified, however, that he saw no need to intervene. He monitored all radio transmissions, and he believed that Officer Hyder was calm and that Hyder had the situation under control. The weather conditions did not preclude pursuit, for it was a clear and sunny day, and the roads were dry. Sergeant Scott believed that Officer Hyder, an experienced and reliable officer with twenty years on the force, could assess the situation for himself.

2. Before he became aware of the police pursuit, Webb had operated the stolen vehicle at normal

### C. The Expert Testimony.

The plaintiff called Robert J. DiGrazia as an expert witness. DiGrazia has held various positions in law enforcement, the most recent of which was Chief of Police of Montgomery County, Maryland. DiGrazia testified that the applicable standard of care for terminating police pursuits is established by MPD General Order 301.3, by lesson plans used in MPD training, and by a traffic regulation. He relied chiefly on excerpts from the General Order, and described the Order in pertinent part as follows:

Under vehicle pursuit it states in the order:

The object of any police pursuit is to apprehend a law violator without causing unnecessary peril to the members involved and the persons or property of citizens.

And the next one says:

Whenever it becomes evident that unnecessary property damage or injury to citizens or members of the department may result from a vehicular pursuit, that pursuit shall be immediately discontinued.

And then in pursuit policy and procedure it says:

Vehicle pursuits, once initiated, in compliance with the provisions of this order, shall be conducted in accordance with the following procedures, and one of them is that authority to control and coordinate the pursuit shall be vested in the Watch Commander of the Communications Division.

And another section talks about the termination.

Members will immediately, and immediately is underlined, discontinue the pursuit, and notify the Communications Division whenever conditions exist, in other words, weather conditions, roadway or pavement conditions, rush hour considerations, vehicular and pedestrian traffic congestion, speed of the vehicle, speed of the chase, excuse me, mechanical handling of the police vehicle, seriousness of the violation of offense, or becomes such that further vehicular pursuit would lead a reasonable

cruising speeds.

person to believe that unnecessary property damage or injury to the citizens or members of department may result.

DiGrazia testified that in his opinion, these standards were violated in this case by Officer Hyder's failure to terminate the pursuit of Anthony Webb. He further opined that this failure was the proximate cause of Banks' injuries. DiGrazia also stated that, in his opinion, Sergeant Scott violated the General Order by failing to direct Officer Hyder to terminate the pursuit.

The District's expert witness was Glenn R. Murphy, who was qualified as an expert in law enforcement management and training and in police pursuits. Murphy testified that under a standard of care applicable throughout the United States, police officers have a duty or responsibility to pursue felons. Murphy defined a pursuit as an activity that occurs after an officer has attempted to stop an automobile by turning on emergency equipment (lights and sirens), and after the driver has refused to stop and has attempted to elude police. According to Murphy, the actual pursuit in this case continued for less than a mile. He testified that any reasonably prudent officer would have pursued Webb under the circumstances, and that Officer Hyder did not violate the MPD General Order or the nationally accepted standard of care.

## II.

### THE NEGLIGENT SUPERVISION ISSUE

*A. The Requirement of Gross Negligence.*

■ Banks, as we have noted, asked that liability be imposed against the District on two separate theories. His first claim involved Officer Hyder's alleged gross negligence in the pursuit of Webb. The second was based on Detective Scott's alleged ordinary negligence in supervising the chase.

In this court, the parties have focused primarily on the sufficiency or insufficiency of the evidence to show gross negligence on

the part of Hyder, and on the correctness or incorrectness of the judge's instruction permitting the jury to find gross negligence on the basis of a violation of the police general order standing alone. Because we are compelled to affirm the judgment on the basis of the jury's verdict as to Banks' negligent supervision claim, however, we do not reach the issues relating to Hyder's alleged gross negligence.

The District of Columbia Employee Non-Liability Act precludes the District from asserting the defense of governmental immunity in cases arising from the negligent operation by a District employee, within the scope of his or her employment, of a vehicle owned or controlled by the District. D.C.Code § 1–1212 (1992).[3] Section 1–1212 further provides, however, that "in the case of a claim arising out of the operation of an emergency vehicle on an emergency run the District shall be liable only for gross negligence." It is undisputed that the police cruiser operated by Officer Hyder during the pursuit of Webb was "an emergency vehicle on an emergency run." *See* D.C.Code § 1–1211(4).

While charging the jury, the trial judge defined, and differentiated between, gross negligence and ordinary negligence. In conformity with § 1–1212, he correctly instructed the jury that, in connection with the chase itself, Banks was required to show that Officer Hyder was grossly negligent. With respect to the negligent supervision claim, however, the judge told the jurors that "negligent supervision, that goes to *ordinary negligence.*" (Emphasis added). He then defined ordinary negligence as

the failure to exercise ordinary care. Thus, negligence is doing something a person who uses ordinary care wouldn't do or not doing something a person using ordinary care would do.

The jurors were thus unambiguously told that the District could be liable on a negligent supervision theory even if no representative of the District was found to have been grossly negligent.

---

**3.** Unless otherwise noted, all further references to the District of Columbia Code are to the 1992    edition.

The District contends that this was error, and we agree. Banks' claims in this case arose "out of the operation of an emergency vehicle on an emergency run," within the meaning of § 1–1212. It was Hyder's pursuit of Webb—the prototypical activity to which § 1–1212 applies—that Scott is alleged to have supervised in a negligent manner. By its unambiguous terms, § 1–1212 was designed to limit the District's liability in pursuit cases to those situations in which a representative of the District was grossly negligent. *See generally* Judge FARRELL'S concurring opinion, *post* at 983.

It would surely be incongruous, in light of the statutory requirement of gross negligence, to suggest that a plaintiff injured solely as a result of ordinary negligence by a supervisor can recover against the District. The statute plainly requires a showing of gross negligence by *someone* acting for the District. To treat a supervisor's ordinary negligence as sufficient would "cut the concept too fine and could significantly cripple the limitation expressly incorporated in the District's waiver of governmental immunity provided for in D.C.Code § 1–1212 (1987)." *Abney v. District of Columbia,* 580 A.2d 1036, 1041 (D.C.1990). As we noted in *Abney,* "generally ... waivers of immunity are to be read narrowly." *Id.* We therefore conclude that the trial judge's instruction to the jury, to the effect that Banks' negligent supervision claim could be made out by proving ordinary negligence on the part of Ser-geant Scott, rather than gross negligence, was contrary to the statute and erroneous.[4]

### B. Plain Error and Invited Error.

■ The District, however, never objected to this instruction, nor did it express any dissatisfaction with it, either directly or indirectly. On the contrary, at the conclusion of the judge's charge, the Assistant Corporation Counsel reiterated her dissatisfaction with the judge's instruction that the jury could find gross negligence on the basis of a violation of the MPD's general order, see pp. 975–976, *supra,* but she did not say a word about the negligent supervision claim.

Moreover, the District effectively invited the judge to treat negligent supervision as requiring ordinary negligence rather than gross negligence. Prior to the judge's charge, the Assistant Corporation Counsel tendered to the court "Defendant's Proposed Verdict Form," which would have inquired of the jury in relation to Count I if the District "was *grossly negligent* in pursuing the fleeing felon," but would have asked as to Count II if the District "was *negligent* in the supervision of its police officers." (Emphasis added).[5]

■ Rule 51 of the Superior Court's Rules of Civil Procedure provides in pertinent part that

> [n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury

4. Although we decide, in Part II.B. of this opinion, that there was no plain error or invited error, our conclusion in Part II.A. that the judge's instruction was erroneous is necessary to our disposition of the case, and thus part of our holding rather than dictum. Absent our conclusion that the gross negligence requirement of § 1–1212 applies to the negligent supervision count, we would be required to address the issue whether the District would be shielded from liability on that count by the public duty doctrine. See Part II.D., *infra.*

5. The District contends that it objected sufficiently to the instruction by arguing, in support of its motion for a directed verdict, that the action was barred by the public duty doctrine. This argument, however, had nothing to do with the degree of negligence required to make out a negligent supervision claim, and counsel plainly failed to "state *distinctly* the matter objected to and the grounds of the objection," as required by Super.Ct.Civ.R. 51. (Emphasis added). See text, *infra,* at 978.

The District's reliance on *Sebastian v. District of Columbia,* 636 A.2d 958, 959–60 & n. 2 (D.C. 1994) is likewise unavailing. *Sebastian* did not involve a failure to object to a jury instruction at all, and the opinion contains no discussion of the consequences of such a failure or of the "distinct[ness]" with which such an objection must be made. Moreover, in *Sebastian,* the District was the appellee and, as we noted in that case, this court could properly affirm the decision on grounds not raised or considered below, provided that there was no procedural unfairness vis-a-vis the appellant. *Id.* (citing *Sheetz v. District of Columbia,* 629 A.2d 515, 519 n. 5 (D.C.1993)). Here, the District is the appellant, and the considerations which were decisive in *Sebastian* do not apply.

retires to consider its verdict, stating distinctly [6] the matter objected to and the grounds of the objection.

The language of the Rule recognizes no explicit exception to its proscription. We may reverse a judgment on the basis of an incorrect instruction, notwithstanding the lack of a sufficient objection, only "where it is apparent from the face of the record that a miscarriage of justice has occurred." *Weisman v. Middleton*, 390 A.2d 996, 1000 (D.C.1978) (citations and internal quotation marks omitted). This is essentially the language of "plain error." *See District of Columbia v. Wical Ltd. Partnership*, 630 A.2d 174, 182–83 (D.C.1993). Moreover, "courts are especially reluctant to reverse for plain error when it is invited," *Wical, supra*, 630 A.2d at 183 (citations and internal quotation marks omitted), and there is more than a hint in this record that the District invited the error of which it now complains.

We find no plain error or miscarriage of justice in this record. The action by the trial court which the District invited or encouraged below, but which it now assails on appeal, is essentially an incorrect statement of the degree of negligence required to establish negligent supervision. Such an error is unfortunate, but it does not rise to the level of a miscarriage of justice. Indeed, in *Joyner v. District of Columbia*, 109 Daily Wash. L.Rptr. 357 (D.C.Super.Ct.1981), the court held, on facts quite similar to those here,[7] that an impartial jury might reasonably find that the District was grossly negligent as a result of the manner in which a pursuing officer conducted a comparable high-speed chase. The District insists that *Joyner* was wrongly decided, and reasonable people might differ on that score.[8] Given the similarity of the two cases, however, a judgment in Banks' favor is not the stuff of which a finding of "miscarriage of justice" is made. Moreover, for the reasons stated in Judge Farrell's concurring opinion, we agree that the error was not "plain" (in the sense of "clear" or "obvious"). *See United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993).

To reverse this judgment on the basis of an instructional error to which the District did not object would prejudice important principles of judicial management. As we observed in *Hunter v. United States*, 606 A.2d 139, 144 (D.C.), *cert. denied*, —— U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992),

[l]itigants should not be permitted to keep some of their objections in their hip pockets and to disclose them only to the appellate tribunal; "[o]ne cannot take his chance on a favorable verdict, reserving a right to impeach it if it happens to go the other way." *Palmer Constr. Co. v. Patouillet*, 42 A.2d 273, 274 (D.C.1945); *see also Hopkins v. United States*, 595 A.2d 995, 996 n. 3 (D.C.1991) (quoting *Patouillet*).

The District suggested at oral argument that these considerations and others like them apply with less force to government attorneys than to private counsel, but we firmly rejected such a contention in *Wical*, 630 A.2d at 183–84, and do so again here.[9] Accordingly, we conclude that the instructional error in question did not constitute plain error, nor did it result in a miscarriage of justice.

---

6. *See also Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967) ("Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal.") (Footnote omitted).

7. Counsel for the District conceded at oral argument that he was unable to proffer a persuasive distinction between *Joyner* and the present case.

8. The author of this opinion wrote *Joyner* in his prior incarnation as a Superior Court judge. *Cf.* Judge Farrell's concurring opinion, *post* at 983.

9. The District contends that "sovereign immunity is a jurisdictional issue" and that "an appellate court is obliged to consider it, even on its own motion if need be," *District of Columbia v. North Washington Neighbors Inc.*, 367 A.2d 143, 148 n. 7 (D.C.1976), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). The District further argues that, for automobile pursuit cases such as this one, its sovereign immunity has been retained in the absence of a showing of gross negligence, that the Assistant Corporation Counsel was without authority to waive it, and that we are obliged so to hold notwithstanding the District's virtual sponsorship in the trial court of the instruction to which it now objects.

The word "jurisdictional" is an elusive one which has various meanings. *See, e.g., B.J.P. v. R.W.P.*, 637 A.2d 74, 77 (D.C.1994). The quoted statements in *North Washington Neighbors*—language which was not a part of the court's holding—were made in relation to the question,

## C. Evidentiary Sufficiency.

■ The District argues that "Sergeant Scott was not grossly negligent (or even negligent) in failing to intercede to stop the pursuit." The District may have a point as to gross negligence, although, in light of the judge's instruction and the lack of any objection thereto, we need not and do not decide that question. Insofar as the District claims that the evidence was insufficient to show ordinary negligence on Scott's part, we are compelled to disagree.

■ The trial judge, who was on the scene and whose vantage point was superior to ours, explicitly rejected this argument in his opinion denying the District's post-trial motions. *See Banks I, supra,* 120 Daily Wash.L.Rptr. at 1610. Moreover, in reviewing the trial court's refusal to grant the District's motion for judgment n.o.v. we must view the evidence in the light most favorable to Banks. *Etheredge v. District of Columbia,* 635 A.2d 908, 915–16 (D.C.1993). It is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant such a motion. *Id.*

In the present case, Sergeant Scott was kept abreast of the developments in the chase as they unfolded. He knew that Webb was suspected of a property offense, not a crime against the person. An impartial jury could reasonably find that Scott also knew or should have known that the pursuit was being conducted at very high speeds in residential areas of the city, that it was early afternoon in broad daylight, and that the speeding vehicles passed by an elementary school at a time when the school could be expected to be open. Moreover, there was evidence that Webb drove recklessly and at high speed only when he was aware that the officers were pursuing him; the jury could reasonably find that the pursuit induced his recklessness at the wheel. We conclude, under these circumstances, that the question of ordinary negligence on Scott's part in supervising the pursuit, and in not ordering its termination, was properly left to the jury. *Cf. Joyner, supra,* 109 Daily Wash.L.Rptr. at 372 (impartial jury could reasonably find that a pursuing officer's failure to terminate a similar chase constituted *gross* negligence on his part).

## D. Public Duty Doctrine.

■ In the trial court, the District contended, remarkably, that liability was barred by the "public duty" doctrine, both in regard to Officer Hyder's pursuit and as to Sergeant Scott's supervision of it. No distinction was asserted as between Banks' two claims in relation to the applicability of that doctrine. Citing a number of our cases, including *Warren v. District of Columbia,* 444 A.2d 1, 4 (D.C.1981) (en banc), the District argued that it was subject to liability for the acts of its employees only if the duty owed to the plaintiff was a special duty to that person as an individual, and that there was no liability if the duty was a general duty to the public at large. The District insisted that any duty Officer Hyder had in conducting the chase, or that Sergeant Scott had in monitoring it, was owed to the public at large and not to Mr. Banks, and that the District therefore could not be held liable.

The problem with the District's position in the trial court is that, if adopted, it would nullify § 1–1212. That statute contemplates that the District of Columbia shall be liable to a person injured in the pursuit of a fleeing wrongdoer if that injury is the result of the District's gross negligence. Under the statute, the duty not to be grossly negligent can be owed only to persons injured in such a pursuit, and the identities of such persons cannot be known to the District in advance. If the District owed no duty to such persons, then § 1–1212 would not confer any rights on anyone. The trial judge emphatically and

---

raised by the court *sua sponte,* whether the District's sovereign immunity for the discretionary or quasi-legislative acts of its officials could be waived. No such issue is presented here, see Judge FARRELL's concurring opinion, *post* at 984, and the District is bound, just as any other litigant would be, *see United States v. Porter,* 618 A.2d 629, 642 n. 24 (D.C.1992), by its counsel's improvident concession that the ordinary negligence standard applies. *Cf. Gauvin v. City of New Haven,* 187 Conn. 180, 445 A.2d 1, 3 (1982) (ordinarily, governmental immunity must be affirmatively asserted in the defendant's pleadings "to apprise the court and the opposing parties of the issues to be tried and to prevent concealment of the issues until the trial is underway.") In the present case, the issue did not emerge until the District appealed to this court.

correctly rejected the District's initial position, and the District has apparently abandoned it on appeal.

The District does contend, however, that if § 1–1212, with its gross negligence standard, does not apply to the negligent supervision claim, then (but only then) the public duty doctrine protects the District from liability with respect to Count II. That is a far more reasonable proposition than the one which the District asserted in the trial court. We have held, however, that the negligent supervision claim is one "arising out of" the operation of an emergency vehicle on an emergency run, and that the gross negligence standard of § 1–1212 does apply to it. Accordingly, we need not decide the purely hypothetical question whether, in the absence of the statute, a negligent supervision claim against the District based on Sergeant Scott's failure to terminate the pursuit would be barred by the public duty doctrine.

## III.

### OTHER ISSUES

We deal briefly with three other contentions raised by the District on this appeal.

### A. Banks' Use of Depositions.

■ During the testimony of plaintiff's expert witness, Robert DiGrazia, Banks' counsel introduced, and the trial judge admitted, the depositions of several officers involved in the pursuit. DiGrazia summarized the depositions rather than reading them to the jury verbatim. The District contends that the depositions were improperly admitted, claiming that none of the officers was an "officer, director, or managing agent" of a party opponent, see Super.Ct.Civ.R. 32(a)(2), and that no showing was made that any of the officers was not available to testify in person.

Assuming, without deciding, that the District preserved its objection,[10] and that the depositions were inadmissible as substantive evidence, we are satisfied that sworn testimony by the officers would be "reasonably relied upon by experts in the particular field." See Rule 703 of the Federal Rules of Evidence, adopted by this court in In re Melton, 597 A.2d 892, 900–04 (D.C.1991) (en banc). The depositions were thus admissible, if not for the truth of the matter asserted, then at least to show the basis upon which DiGrazia reached his conclusions. The District may well have been entitled to an instruction that the depositions could be considered only for that limited purpose, but no request for such a limiting instruction was made in the trial court.[11] Under these circumstances, the admission of the depositions does not warrant reversal of the judgment.

### B. The Hospital Records.

■ Following the accident, Banks was a patient at the Washington Hospital Center for ten weeks. He testified that his hospital bill was $154,333.64. The bill was received in evidence without objection.

Banks was hospitalized again on four subsequent occasions during the following year and incurred bills totalling $115,000.00. His bills and medical records relating to these admissions were received in evidence over defense objection. The District contends that Banks offered no expert testimony to prove that the conditions being treated during his later hospitalizations were caused by the accident, and that the records were therefore inadmissible.

Counsel for the District failed to object, however, when Banks was questioned about his subsequent hospitalizations. During the course of his testimony, he stated the amount of each hospital bill and described the conditions for which he had been treated. No claim was interposed that the evidence was irrelevant, or more prejudicial than probative, or inadmissible for any other reason. The District's subsequent objection to the admission of the records containing essentially the same information resembled a demand that the judge lock the barn door after the horses had fled.

The District may very well be correct in its view that no sufficient foundation was laid to establish the relevance of the documentary evidence to which it objected. By the time

---

10. According to Banks, his counsel submitted the depositions and related documents at pretrial, without objection by the District.

11. But see Melton, supra, 597 A.2d at 907 n. 28, recognizing the possibility that such a limiting instruction may be hard for a lay juror to follow.

the District objected, however, the substantive information had already come before the jury without any comment by defense counsel. Assuming, without deciding, that the District's failure to object to the testimonial evidence about the later hospitalizations did not preclude the District from objecting to the hospital bills and records (where the grounds for the objection applied equally to Banks' testimony on the subject), any incremental prejudice to the District as a result of the admission of the documents was surely negligible, and any error was harmless. *See* Super.Ct.Civ.R. 61; *R & G Orthopedic Appliances & Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 538–41 (D.C.1991). Accordingly, the judge's admission of records which basically confirmed evidence which the jurors had previously heard does not provide any basis for ordering a new trial.

### C. The Verdict Form.

After rejecting at least two proposed forms submitted by the District, the judge utilized a verdict form submitted by counsel for Banks which, with the exception of the caption, we reproduce in its entirety below:

**VERDICT FORM**

Count I
*Gross Negligence High Speed Chase*
(Check one)
We the jury find that the
officer was grossly      Yes _____
negligent:

No _____

Count II
*Negligent Training and Supervision*
We the jury find that the
defendant was negligent    Yes _____
in supervising the officer
conducting the pursuit:    No _____
If you answered no on both counts, stop here and *return your verdict to the Court.*
If you answered yes on either count, what damages do you award to plaintiff?
$_____

_____
Foreman or Forewoman

**12.** It would, however, have been helpful, in the inquiry in Count I, to identify the officer as to whom the inquiry was being made by name, or by his role in the pursuit.

**13.** In a criminal case, the heading "Murder" in a verdict form would surely not be taken as meaning that the judge believed the defendant to be guilty of murder.

The District contends that "the language of the form was biased and favored the plaintiff." Although these characterizations are not necessarily accurate, we agree that the form was less than exemplary. The two headings were unnecessary, for the substantive inquiries below them apprised the jurors of the two specific findings they were being asked to make.[12] Although we are confident that the jury did not view the inclusion of the headings as somehow signifying the judge's belief that the conditions described in the headings existed,[13] it is best to avoid even the slightest possibility of such a misapprehension.[14] Moreover, the second heading was misleading; although Banks had initially alleged negligent training as well as negligent supervision, his counsel had dropped the former claim before trial. Nevertheless, the actual questions propounded to the jury were fairly phrased, and the inaccuracies in the titles did not, in our view, significantly prejudice the District.

A more serious problem is presented by the last sentence of the form: "If you answered yes on either count, what damages do you award to plaintiff?" If the verdict form stood alone, and if the jurors had heard nothing else from the judge, they might perhaps have assumed that a showing of gross negligence by the pursuing officer, or of negligent supervision by Sergeant Scott, without more, would warrant an award of damages. The requirement of proximate cause was not mentioned in the verdict form utilized by the judge, and some of the language contained (or not contained) in the form could be read as suggesting that proof of proximate cause was not required.

The District dealt with this problem sensibly in its revised proposed verdict form by inquiring as follows with respect to gross negligence:

**14.** *Cf.* 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE, § 2508, at 507 (1971 & Supp.1994) ("A question [to the jury] should not assume the existence of a material fact in controversy ... unless the evidence is so conclusive that reasonable men could reach but one conclusion").

1. How do you find on the plaintiff's allegation that the District of Columbia was grossly negligent in pursuing the fleeing felon?

For: the plaintiff_____

the defendant_____

2. If you find for the plaintiff, is the District of Columbia's gross negligence the proximate or legal cause of the accident?

Yes                No

The District repeated this two-step format in relation to the negligent supervision count in questions 3 and 4, and then concluded its proposed form as follows:

If your answers to Nos. 2 and 4 above are "no," stop here. If you answered "yes" to Nos. 2 or 4, please answer the following:

5. What amount, if any, do you award the plaintiff for his damages?

The District's proposal was consistent with the court's instructions and would have avoided the problems presented by the verdict form proposed by the plaintiff and used by the judge.

Rule 49 of the Superior Court's Rules of Civil Procedure, which is identical to its federal counterpart, authorizes the trial judge to require a jury to return only a special verdict or to return a general verdict accompanied by answer[s] to interrogatories. Accurate and impartial phrasing of the special verdict or of the interrogatories to the jury is important. As the court explained in *Scott v. Isbrandtsen Co.*, 327 F.2d 113, 119 (4th Cir. 1964),

[a] trial court has discretion in the use of special verdicts and this discretion is not limited to the decision with respect to such use but extends beyond to the form of the submitted interrogatories once such decision is made. Although the court is vested with a wide discretion as to the form and substance of the interrogatories, all material factual issues should be covered by the questions submitted. The number and form of issues, *if they present the case fairly*, are matters resting in the *sound discretion* of the trial judge. Generally,

Rule 49(a) permits submission of special interrogatories to juries on issues of fact, but if an issue presents a mixed question of fact and law it may be submitted if the jury is instructed as to the legal standards to be applied; the form of the special issues should be such as not to mislead or confuse the jury.

(Emphasis in original; footnotes omitted). Given the analysis in *Scott*, with which we concur, the leap in the trial judge's verdict form from gross negligence and negligent supervision directly to damages, without any reference to proximate cause, is somewhat problematical.

The jurors were, however, appropriately instructed on several occasions on the issue of proximate cause. Just before the judge explained the verdict form to the jury, he stated that the burden was on the plaintiff to prove, by a preponderance of the evidence, that the defendant's negligence or gross negligence was the proximate cause of the accident. Shortly after discussing the verdict form, the judge again focused on proximate cause. He explained to the jurors that if they found that the District was negligent or grossly negligent, then "the plaintiff may recover only the portion of the damages which resulted proximately from the defendant's negligence." [15]

We therefore conclude that although proximate cause was not specifically mentioned on the verdict form, there is no appreciable possibility that the jurors believed that the plaintiff could prevail without proving by a preponderance of the evidence that the District's wrongful conduct proximately caused his injuries. Accordingly, although some of the phrasing of the verdict form was infelicitous,[16] its use did not constitute error warranting reversal of the judgment.

## IV.

### CONCLUSION

For the foregoing reasons, the judgment appealed from is hereby

*Affirmed.*

---

**15.** There was no objection to the judge's repeated allusions to negligence and gross negligence in the alternative, without further elaboration on which kind of negligence was required in the particular situation under discussion.

**16.** The judge candidly advised the jury, with regard to the verdict form, that "I'm still not satisfied with it, but the trial is at the conclusion, and I'm tired of fighting."

**FARRELL**, Associate Judge, concurring:

I agree with the court that the evidence was sufficient, though in my view barely so, to permit a jury to find ordinary negligence on the part of Sergeant Scott,[1] and that under plain error analysis the erroneous application of a simple negligence standard to Scott's conduct is not enough to warrant reversal.[2] My analysis, however, differs enough from the majority's that I add this brief opinion.

First, my review of the record convinces me that no rational juror could reasonably have found that Officer Hyder was *grossly* negligent in conducting the chase. On the facts presented here, a finding of gross negligence—action marked by "a wanton and reckless disregard for others in pursuing [an offender]," *Boyer v. State,* 323 Md. 558, 594 A.2d 121, 132 (1991)—would obliterate the statutory distinction between negligence and gross negligence critical to the limited waiver of immunity in D.C.Code § 1–1212 (1992). Bear in mind that 18 DCMR § 2002 (1987) exempts a police officer conducting a vehicle pursuit from the *per se* unlawfulness of ignoring red lights or stop signs or "[e]xceed[ing] the *prima facie* speed limit...." Hypothetical ordinary negligence, therefore, would necessarily mean that the officer did these "privilege[d]" acts, *id.,* without due regard to the attendant circumstances and the risk they created for the safety of others. It follows that the finding of gross negligence or recklessness required by the statute must demand some additional feature of aggravation—such as, for example, ignoring a radio command of one's supervising officer to terminate the chase—that no one has identified in this record.

Second, the error in submitting the gross negligence count as to Officer Hyder to the jury was compounded by an erroneous jury instruction which allowed the jury to find Hyder grossly negligent based upon a finding, without more, that he had violated Metropolitan Police Department General Order

301. The trial judge quoted at length from the General Order, which describes the circumstances in which an officer should terminate a vehicle pursuit, and then told the jury: "Now, if you find that the foregoing ... General Order ... has been violated ... then you may find gross negligence and ... it would be appropriate to return a verdict for the plaintiff." This instruction is incompatible with our holding in *Abney v. District of Columbia,* 580 A.2d 1036, 1041 (D.C.1990), that the same General Order "serves the purpose of an internal operating manual" and does not "purport to implicate the District's waiver of governmental immunity" in § 1–1212—in other words, that it "provide[s] officials with guidance on how they should perform those duties ... mandated by statute or regulation" but is not itself a regulation whose violation by itself may support a finding of negligence, let alone gross negligence. A proper instruction would have told the jury that a failure to heed the guidance of the general order was a factor it could consider, but that the determination whether Hyder was grossly negligent must be made by considering the totality of the circumstances.

Nevertheless, as indicated, I agree that the government's failure to challenge the ordinary negligence instruction as to Sergeant Scott—indeed its sponsorship of that instruction—leaves us unable to reverse the judgment, given the sufficiency of the evidence of simple negligence on Scott's part. But my reasoning differs somewhat here as well. I agree with the court that, properly read, § 1–1212 limits the District's liability to gross negligence in the case either of the pursuing officer or of an officer supervising the pursuit from the police station. The most natural reasoning of the expansive phrase "a claim *arising out of* the operation of an emergency vehicle on an emergency run" (emphasis added) is that it embraces the conduct of any officer participating in the chase, whether as driver or as immediate

---

1. I say barely so because Scott, supervising an officer (Hyder) with twenty years' experience on the police force, not implausibly thought that Hyder, the driver of the police car, was in the best position to judge whether to terminate the pursuit.

2. I also agree with the court's disposition of the "Other Issues" beginning *ante,* at 980.

supervisor. But, since the District did not object to the ordinary negligence standard as to the supervising officer, our analysis is governed by plain error principles, which require at the outset that any error be "plain." "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). The meaning of "a claim arising out of" as including conduct by others besides the operator of an emergency vehicle is not "obvious," such that the government can be excused for not having argued it—indeed, for having sponsored the contrary meaning—before the trial court. The provision limiting the District's liability (for claims "arising out of the operation of an emergency vehicle") qualifies the antecedent waiver of governmental immunity for claims of injury caused by the wrongful act of a District employee "occurring as the result of *the operation by such employee* ... of a vehicle owned ... by the District ..." (emphasis added). The implementing regulation, 18 DCMR § 2002.4, likewise states that "[t]he provisions of this section [exempting '[t]he driver of an emergency vehicle' from certain traffic regulations] shall not relieve *the driver* of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons ..." (emphasis added). And, as indicated, the District's attorneys shared this limited view of the statute's reach in the trial court. As it could not have been "obvious" to the trial judge that an employee under the statute included a supervisor as well as the driver, I do not see how we can reverse on the basis of an instruction the parties jointly urged him to give.

Finally, I agree with the court that this is not a case where we may not give legal effect to a government attorney's failure to assert an aspect of sovereign immunity. Our statement in *District of Columbia v. North Washington Neighbors, Inc.,* 367 A.2d 143, 148 n. 7 (D.C.1976), that "since sovereign immunity is a jurisdictional issue, an appellate court is obliged to consider it, even on its own motion if need be," was made in the context of determining whether certain governmental acts were "discretionary" or "ministerial"— the District's sovereign immunity "surviv[ing]" for the former but not the latter.

*Id.* Other courts as well have recognized that when sovereign immunity aims to protect discretionary judgments, it is a jurisdictional bar to suit that cannot be waived. *E.g., Pickle v. Board of County Comm'rs,* 764 P.2d 262, 264 (Wyo.1988). But this case involves no issue of discretionary or "quasi-legislative policy decisions," *McKethean v. WMATA,* 588 A.2d 708, 713–14 (D.C.1991), nor is it a case where the legislature has refrained altogether from waiving sovereign immunity with respect to tort claims of the present type. *Cf. Stein v. Southeastern Michigan Family Planning Project,* 432 Mich. 198, 438 N.W.2d 76, 78–79 (1989) ("[F]ailure to plead sovereign immunity will not constitute a waiver because 'failure to plead the defense ... cannot create a cause of action *where none existed before'*" (citation omitted; emphasis added). The legislature having allowed suit for these acts or omissions in § 1–1212, "the sovereign immunity doctrine's jurisdictional bar to bringing suit," *Powell v. District of Columbia,* 602 A.2d 1123, 1126 (D.C.1992), is not implicated in this case, and I see no reason why the government attorney's failure to assert the gross negligence standard as to the police supervisor should not be treated like any other default of a party in preserving an issue.