*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CV-486

JAMES E. TILLERY, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAV-8554-15)

(Hon. Marisa Demeo, Trial Judge)

(Argued January 29, 2020                    Decided   May 21, 2020)

*Frederic W. Schwartz, Jr.*, for appellant.

*Lewis Preston*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. Alikhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, and *Irina M. Majumdar*, Assistant Attorney General, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and MCLEESE, *Associate Judges*.

GLICKMAN, *Associate Judge*:  This is an appeal from the award of summary judgment to the defendant in a personal injury action.  According to the plaintiff James Tillery's proffered evidence, in response to a report of a property crime then

in progress, Metropolitan Police Officer Robert Hamrick drove his police car at approximately forty-eight miles per hour on a residential street through a stop sign, without stopping and with neither his emergency lights nor sirens activated, and crashed into Mr. Tillery's vehicle in the intersection. Mr. Tillery sued the District of Columbia for the injuries he sustained from the accident. The central issue in this case is whether a reasonable jury could infer that Officer Hamrick's driving was grossly negligent, the standard that must be met to overcome the District's claim of governmental immunity under these circumstances. On that issue, the trial court ruled in favor of the District. We reverse.

**I.**

Viewing the record in the light most favorable to Mr. Tillery, as we must at this stage,[1] the pertinent facts of this case are as follows: At around 1:00 p.m. on November 7, 2014, Officer Hamrick was driving north on 3rd Street Northwest in a residential neighborhood where the speed limit was twenty-five miles per hour, when he heard on his radio that someone reportedly was "ripping out the insides of a truck" in a block the officer recently had driven past. The dispatcher did not give

---

[1] *See, e.g.*, *Childs v. Purll*, 882 A.2d 227, 233 (D.C. 2005).

Officer Hamrick a "Code 1 assignment" – an assignment to respond to an "emergency" – or indicate that anyone was in danger. But Officer Hamrick considered it necessary that he go immediately to the scene because other officers would be "responding to an individual with a crime in progress" and he "didn't know [whether the suspect] had a weapon."

Officer Hamrick activated his patrol car's lights and sirens, made a U-turn, and drove south towards the intersection of 3rd Street and Quackenbos Street. There was four-way stop signage at that intersection. Officer Hamrick claimed to have "cleared the stop sign" at the intersection, "meaning that [he] didn't feel that any vehicle was approaching from either direction that did not have a stop sign and/or did not observe [him] with [his] lights." He did so, he testified, by slowing down "in the center of the block" and stopping about "two car lengths" from the stop sign to see whether any vehicles were approaching. However, the Metropolitan Police Department crash summary report, which was produced by extracting data from Officer Hamrick's vehicle, shows that Officer Hamrick accelerated from thirty-three to forty-eight miles per hour in the five seconds before his airbags deployed in the ensuing collision. The data indicated that Officer Hamrick did not slow down and come to a complete stop two car lengths before the stop sign but, instead, accelerated from thirty-three to forty-eight miles

per hour and drove *at least* the length of a football field without stopping before he arrived at and entered the intersection.[2]

After "clearing" the stop sign, Officer Hamrick deactivated his emergency sirens because he "didn't want to alarm the criminal." As he approached Quackenbos Street at an increasing rate of speed, he passed a construction truck parked on his left near the intersection. Due to the truck and surrounding traffic barrels and cones, the roadway of 3rd Street was narrowed at this point to about one-half its usual width. After passing the truck, Officer Hamrick said, he saw Mr. Tillery on his left proceeding west on Quackenbos Street toward the intersection. Mr. Tillery was "closer to the stop sign than [him]self." Officer Hamrick said he "assumed" that Mr. Tillery saw him and would yield to him because, he claimed, his emergency lights remained activated after clearing the intersection. However,

---

[2] The crash summary report shows Officer Hamrick's speed in ten half-second intervals, beginning five seconds before the point at which his airbags deployed. The report shows that he accelerated from thirty-three to forty-eight miles per hour in four seconds, and then began to decelerate less than one second before his airbags deployed. The deceleration was slight; according to the crash data, Officer Hamrick's final speed was forty-four miles per hour. His average speed across five seconds was about forty-one miles per hour, implying that he traveled 300 feet in that time interval. This estimate does not include the additional distance Officer Hamrick traveled while accelerating from zero (after he stopped somewhere in the block) to thirty-three miles per hour.

according to a witness, one of the construction workers at the site, Officer Hamrick's emergency lights were not on as he drove towards the intersection.

Mr. Tillery did not yield to Officer Hamrick and entered the intersection first. Officer Hamrick could not stop in time and crashed into the passenger side door of Mr. Tillery's vehicle. Mr. Tillery testified that he had stopped at the stop sign on Quackenbos Street and looked both ways before he entered the intersection. Looking to his right, where the construction truck was parked and the direction from which Officer Hamrick was coming, Mr. Tillery said he could see only about fifteen feet up the street. He did not see Officer Hamrick at that time and first saw him after the collision.

Mr. Tillery sued the District in Superior Court to recover for his injuries resulting from the car accident. The District eventually moved for summary judgment, arguing that it was immune from suit because no reasonable jury could find that Officer Hamrick was grossly negligent. The trial court agreed and awarded judgment to the District.

## II.

"We review a grant of summary judgment *de novo*, applying the same standard as the trial court."[3] In order to prevail under that standard, the moving party "must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law."[4] A fact is "material" if its existence "might affect the outcome of the suit under the governing law," and a factual issue is "genuine" if the evidence permits a reasonable jury to find that issue in favor of the non-moving party.[5] In assessing whether summary judgment is proper, "[w]e view the record in the light most favorable to the non-moving party."[6]

## A.

Under the D.C. Employee Non-Liability Act,[7] the District has waived its

---

[3] *Johnson v. Washington Gas Light Co.*, 109 A.3d 1118, 1120 (D.C. 2015).

[4] *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] *Childs*, 882 A.2d at 233.

[7] Pub. L. No. 86-654, 74 Stat. 519 (July 14, 1960) (codified as D.C. Code §§ 2-411 *et seq.*).

defense of governmental immunity in suits for damages caused by a District employee's negligent operation of a District-owned vehicle while acting within the scope of his employment.[8]  But for "a claim arising out of the operation of an emergency vehicle on an emergency run the District shall be liable only for gross negligence."[9]  It is undisputed that, at the time of the accident, Officer Hamrick was operating an emergency vehicle on an emergency run within the meaning of the statute.[10]

The District's liability, therefore, depends on whether Officer Hamrick was grossly negligent in causing the collision with Mr. Tillery.  A finding of gross negligence, we have explained, "requires such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others."[11]  That standard "connote[s] that the actor has engaged in conduct so extreme as to imply

---

[8]  D.C. Code § 2-412 (2016 Repl.).

[9]  *Id.*

[10]  *See Duggan v. District of Columbia*, 884 A.2d 661, 663 (D.C. 2005) (*Duggan II*) (en banc) ("For gross negligence to apply, all the statute requires is a genuine – an honestly held – 'belie[f]' by the operator that he should proceed expeditiously on a mission or to a location in response to a 'supposed emergency.'").

[11]  *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997).

some sort of bad faith."[12]  Where there is no evidence of subjective bad faith, "the extreme nature of the conduct may be shown by demonstrating that the actor acted in disregard of a risk 'so obvious that [the actor] must be taken to be aware of it and so great as to make it highly probable that harm would follow.'"[13]  We have said, in applying that standard, that "a useful beginning point for analysis may be to examine the standard of care which must be breached . . . for simple negligence to be found."[14]  For gross negligence "to be meaningfully distinguished from simple negligence," there must be "serious aggravating factors in the conduct of the police officer beyond those necessary to establish simple negligence in the first place."[15]

Although nothing in the record suggests that Officer Hamrick acted in bad faith, a reasonable jury could find he drove his vehicle with conscious indifference to the rights and safety of others.  As a starting point, a jury certainly could find that Officer Hamrick was at least negligent in violating two rather specific traffic

_____

[12] *Id.*

[13] *Id.* at 44-45 (quoting 3 S. Speiser, *et al.*, The American Law of Torts, § 10.2, at 361 (1986)).

[14] *Id.* at 45.

[15] *District of Columbia v. Henderson*, 710 A.2d 874, 877 (D.C. 1998).

regulations:[16] the first requiring him to stop at a stop sign, and the second requiring him to drive within the road's speed limit.[17] To be sure, traffic regulations permit a police officer, in some instances, to proceed past a stop sign without stopping, "but only after slowing down as may be necessary for safe operation," and to exceed a road's posted speed limit, but only if doing so "does not endanger life or property."[18] Here, however, there was evidence from which a reasonable jury could find that Officer Hamrick did not slow down as was reasonably necessary and that he drove at an excessive speed that did endanger others. Furthermore, the regulations state that the "exemptions" for police officers "apply only when the driver of the vehicle while in motion sounds an audible

---

[16] *See, e.g.*, *Leiken v. Wilson*, 445 A.2d 993, 1001 (D.C. 1982) ("We conclude that a defendant's failure to comply with traffic regulations creates a presumption of negligence.").

[17] 18 DCMR §§ 2200, 2208 (2020). In this way, Officer Hamrick also violated MPD General Order 301.1, which requires officers to "comply with all applicable traffic regulations." A violation of an MPD General Order, we have said, "is a factor the jury can consider in determining whether the officer was grossly negligent in departing from the standard of care." *Duggan v. District of Columbia*, 783 A.2d 563, 570 (D.C. 2001) (*Duggan I*), *opinion amended and reinstated on reh'g*, 884 A.2d at 662.

[18] 18 DCMR § 2002.2(b)-(c) (2020).

signal by bell, siren, or exhaust whistle as may be reasonably necessary."[19]  Officer Hamrick did not sound any audible alarm.

In addition, a reasonable jury could find that Officer Hamrick's negligence was aggravated by certain aspects of his behavior.  First, Officer Hamrick did not merely exceed the posted speed limit; he drove up to forty-eight miles per hour despite being aware that he was on a residential road where the speed limit was only twenty-five miles per hour.  Driving at such a high rate of speed – almost double the speed limit – severely limited his and other motorists' reaction time and thus their ability to avoid a collision.

Second, a jury could find that not only did Officer Hamrick fail to slow down, he heedlessly *accelerated* as he approached the intersection.   And the jury relatedly could find that if Officer Hamrick "cleared the intersection" at any point, he did so from too far away to make a reasonable judgment that it would be safe to speed through it when he got there.  Based on the acceleration of his vehicle reported in the crash summary report, if Officer Hamrick did stop to clear the intersection, it was only when he was over a hundred yards away from it.  That was

---

[19]  *Id.* § 2002.3.

too far away, a jury could conclude, for him to be sure no motorist on Quackenbos Street would be about to enter or be driving in the intersection when his police vehicle got there.[20]

Third, a jury could find it seriously aggravating that Officer Hamrick drove with neither his siren nor (as a witness testified) his emergency lights activated. By doing so, the jury could find, he deprived other motorists of the necessary warning to yield to him and left Mr. Tillery helpless to avoid the collision. And the jury could conclude that this risk was obvious to Officer Hamrick from the fact that, as he testified, he intentionally deactivated his siren so as not to "alarm the criminal" of his approach.

Fourth, a jury could find that Officer Hamrick disregarded the obvious fact that a construction truck blocked his and Mr. Tillery's ability to see each other's vehicle. Officer Hamrick testified that he saw Mr. Tillery only after passing the

---

[20] The District points out that the crash summary report shows that Officer Hamrick slowed down slightly, from forty-eight to forty-four miles per hour, less than one second before his airbags deployed, and that his airbags deployed while he was traveling thirty miles per hour. We think a reasonable jury could reject the argument that this shows Officer Hamrick exercised caution by slowing down before the intersection, and could instead find he slowed (or instead, slammed on his brakes) only when it was too late to avoid the collision.

truck, and Mr. Tillery said that due to the truck, he could see only about fifteen feet up 3rd Street in the direction from which the officer was coming.

Fifth, Officer Hamrick testified that he *saw* Mr. Tillery after passing the truck, yet still attempted to speed through the intersection under the "assum[ption]" that Mr. Tillery would yield to him, without confirming that he would do so, and without accounting for the likelihood (as the jury could find) that Mr. Tillery would not be aware of the danger posed by the onrushing police car with its lights and siren deactivated. A jury could find that Officer Hamrick's reliance on a mere assumption in these circumstances that Mr. Tillery would yield to him was not merely unreasonable, but highly reckless.

Sixth, a reasonable jury could find that there was no genuine urgency impelling Officer Hamrick to disregard safety considerations in responding with haste to the report of a crime in progress. The dispatcher did not provide Officer Hamrick with a Code 1 assignment or give him any indication that anyone was in danger; the report was only of a property crime being committed at a location in the vicinity. And because the scene of the reported crime was nearby, a jury also could conclude that Officer Hamrick had little need to speed in order to get there expeditiously. Although Officer Hamrick said he perceived an exigency requiring

his immediate presence because other officers were responding to the scene and the suspect might have been armed, we think a jury reasonably could deem that mere supposition insufficient to excuse reckless driving that put other motorists in danger of their lives.[21]

In sum, we are confronted with a situation in which the jury could find that an officer knowingly drove in great excess of the speed limit through a stop sign, without his siren or emergency lights activated, after seeing another motorist approaching the intersection before him, in an area where his visibility to that other motorist was obstructed, and without any real need or justification for doing so. As we have said before, "whether conduct constitutes gross negligence is a question of fact for a jury to determine."[22]  Based on the above, we believe a reasonable jury could find that Officer Hamrick was grossly negligent in the operation of his patrol vehicle.

---

[21]  There is a marked contrast between the facts of this case and those of some of the hot pursuit cases this court has seen, in which exigent circumstances may require officers on the spur of the moment "to weigh the urgency of making an immediate apprehension of someone in a vehicular pursuit against the foreseeable risk of death or injury to everyone involved." *Walker*, 689 A.2d at 45. The need for that type of delicate judgment was not present in this case.

[22]  *Duggan I*, 783 A.2d at 569.

**B.**

Our cases do not require a contrary conclusion.  In *Dickson v. District of Columbia*[23] and *District of Columbia v. Henderson*,[24] police officers exceeded the speed limit, failed to slow down at an intersection as they were supposed to, and crashed into another motorist as a result.  In both cases, we concluded that no reasonable jury could find the officers to have been grossly negligent.  But those cases involved markedly different factual circumstances.  Unlike what a jury could find in the case of Officer Hamrick, the officers in *Dickson* and *Henderson* exercised at least some level of care: the officer in *Dickson* exceeded the speed limit by only five miles per hour while his lights were activated and as he was manually turning his sirens on and off to alert other drivers of his presence,[25] and the officer in *Henderson* exceeded the speed limit by only five to ten miles per hour while both his lights and sirens were activated.[26]  The officers thus undertook to alert other motorists to their presence and afford them a chance to avoid a collision.  Officer Hamrick did not take such precautionary measures.

[23]  938 A.2d 688 (D.C. 2007).

[24]  710 A.2d 874.

[25]  938 A.2d at 690.

[26]  710 A.2d at 876.

Citing *District of Columbia v. Walker*[27] and *District of Columbia v. Banks*,[28] the District argues that a valid finding of gross negligence "is extremely rare." More recent decisions of this court prove otherwise.[29] More important, neither *Walker* nor *Banks* answered the question we are confronted with today.

In *Walker*, police pursued a juvenile driver with their lights and sirens activated at speeds of up to fifty miles per hour and through several red lights in the District of Columbia. When the juvenile entered Maryland, the police continued their chase at speeds of up to 90 miles per hour in areas where traffic was light and no pedestrians were nearby. On a limited access highway in

---

[27] 689 A.2d 40.

[28] 646 A.2d 972 (D.C. 1994).

[29] *See District of Columbia v. Chambers*, 965 A.2d 5, 16 (D.C. 2009) (jury could reasonably find officer grossly negligent in chasing vehicle at speeds of fifty to eighty miles per hour through populated District streets); *Duggan I*, 783 A.2d at 569 (jury could reasonably find officer grossly negligent "in an automobile chase of a juvenile for approximately three or four blocks at speeds up to 60 miles per hour, on streets which were slippery and wet from rain and leaves, in a partially residential and commercial area, during a time when young people from the seven schools in the area were being dismissed for the day"); *District of Columbia v. Hawkins*, 782 A.2d 293, 303 (D.C. 2001) (jury could reasonably find police grossly negligent in "chase [of] over nearly a mile of city streets in a densely populated urban neighborhood, near schools and into an intersection known to be crowded during rush hour. Each of the drivers of the police vehicles was familiar with the conditions which created the hazard and continued the chase at exceptionally high rates of speed [up to 90 miles per hour].").

Maryland, the juvenile crossed onto the other side of the road and crashed into another motorist. We held only that no reasonable jury could find the police officers were grossly negligent *at the time of the accident* in chasing the juvenile on the limited access highway even assuming (but without deciding) that the police were grossly negligent in their high speed pursuit of the juvenile through red lights on the streets of the District.[30] That narrow holding lends no support to the District's argument that Officer Hamrick's driving in this case was less than grossly negligent.

In *Banks*, a police officer chased a vehicle driving between fifty and eighty miles per hour past an elementary school and through several red lights. The trial judge instructed the jury on a theory of simple (rather than gross) negligence in the supervision of the pursuing officer. The District did not object to that instruction at trial, and the jury found the District liable for simple negligence. On appeal, this

---

[30] *See Walker*, 689 A.2d at 46 ("Therefore, in deciding whether the conduct of the MPD officers could be found to constitute gross negligence, we necessarily focus in the first instance on Suitland Parkway, where the collision took place. Even assuming solely for the purpose of argument but not deciding that the officers were grossly negligent at an earlier point in the pursuit due to the conditions on Sixth Street or Alabama Avenue, such gross negligence did not in itself cause any injury." (footnote omitted)). The court also held that the District could not be found liable for gross negligence in training the officers based on the non-gross negligence of the officers.

court found error in the instruction, but not plain error.[31] The court thus "affirm[ed] the judgment without reaching the substantial and difficult issues relating to Banks' claim . . . of gross negligence."[32] In a concurring opinion, Judge Farrell addressed those issues. He concluded that no reasonable jury could have found the pursuing officer to have been grossly negligent based merely on the officer's violation of an MPD General Order (as the trial judge had instructed), or for failing to observe the speed limit and stop at stop signals, inasmuch as the officer had activated his emergency equipment and was thus "exempt[ed] . . . from the *per se* unlawfulness of ignoring red lights or stop signs or '[e]xceed[ing] the *prima facie* speed limit.'"[33] In this case we are not concerned with any jury instruction permitting a finding of negligence or gross negligence based on a violation of a General Order, and a jury could find that Officer Hamrick did not have his emergency equipment activated when he neared the intersection of 3rd and Quackenbos Streets.

---

[31] *See Banks*, 646 A.2d at 974.

[32] *Id.*

[33] *Id.* at 983 (Farrell, J., concurring) (quoting 18 DCMR § 2002 (1987)).

## III.

For the foregoing reasons, we reverse the trial court's award of summary judgment to the District and remand for further proceedings consistent with this opinion.

*So ordered.*